We'll proceed to the second case of the day. HH-Indianapolis v. Consolidated City of Indianapolis. Ms. McCampbell. Good morning. Erin McCampbell on behalf of HH-Indianapolis Appellant. May it please the Court. This appeal presents a classic First Amendment issue. Namely, whether a municipality has the ability to use the power to zone as the ability to suppress unwanted speech. In this case, my client, HH, presented permit applications to the City for construction and sign permits. Shortly thereafter, there was public outcry with respect to our client operating at that particular location. And that outcry, we believe, triggered the City's denial of our permits on the basis of HH's unwanted speech. What we're presenting here, in essence, is a content-based prior restraint as applied claim. The City does not have the authority to preclude speakers from speaking at a location they are able to operate at as of right, simply because their speech is unwanted. Here we have an issue as to whether or not HH is, as the City claims, an adult speaker, meaning an adult business, or, as we say, a business that presents and offers its customers a minimal amount of adult products and adult merchandise, but significant quantities, 75% or more of its merchandise is books, T-shirts, gag gifts, games, non-adult, quintessentially protected material. I'm curious about one thing, and that is your client purchased or, I guess, got a 10-year lease on this property before looking into this issue about whether you can do it in a C3 or something? Yes. If they went across the street, as they say, in a C4 or something, this would be a problem. So our client does not intend to offer, and there is no proof that it will or that it would offer, more than 25% of its merchandise to be adult merchandise. So based on that, it is allowed to operate as of right in a C3 zone. We contacted the City before signing the lease because at the time we had located that particular property, the City was undergoing a renovation to its ordinances, and we were concerned that they may alter the language of the ordinance, which they're allowed to do, but may, say, for example, drop the threshold to 5% or 10% of adult material, and then we may not want to operate at that particular location. So we confirmed with a City official from the Planning Department that the code, as it was proposed for its future revisions, was going to remain the same, the 25% threshold. Based on that, we signed the lease for the space and submitted what we felt were permits that any other general retail light organization would submit, namely the sign permit application and the construction permit application to conduct renovations to the space. So we did seek out, I guess you could say, advice from the City to make sure that they were not going to alter their statute, but we did not believe we needed permission from them, for example, a variance to operate there, because we've never taken the position that we're an adult enterprise of any kind under the municipal law. You're not seeking a variance, are you? No, we're not. We believe that we're entitled to operate there as of right because we are not going to sell more than 25% of adult material. We have no intent to offer videos, live performances, classes. Anything that's been pointed out that other corporations in other cities under other municipal laws have done, we have no intent to do that here. So for that reason, we have not taken the step to seek a variance because we do not believe that's necessary for us to do to operate there as of right. Isn't this so-called adult material sort of an eyes of the beholder? Well, actually, the City itself has a specific definition, and it's basically two different categories of material that we would sell. One is books, videos, magazines, printed material that depicts specific specified sexual activities. The second is- Is that the kind of stuff they put in a round envelope and people can carry it out? Well, they would carry it out in whatever bag and packaging is on it, but yes, it's adult material, undoubtedly. For things that are just not generally exposed, I frankly have a hard time. I just can't envision exactly what kind of material is okay and what isn't and what is adult. Okay. So, for example, we sell a whole line of products for bachelorette parties. There's keychains, there's stashes, all kinds of games, fun things that bachelorettes can do for their parties. Those particular items would qualify as printed material, especially the games and those types of materials, but they're not actually adult because they're not characterized- Like spin the bottle. Excuse me? A game like spin the bottle? Something of that nature, yeah. I mean, I don't have them in front of me and they're not part of the record, but there are plenty of materials that we sell. T-shirts, bumper stickers, gag gifts, joke books, those types of things that would not- They're printed material, but they would not qualify under that first definition. The second definition of adult products involves devices, and they specify that they are devices used for the stimulation of human genital organs. We sell a portion of those devices. All of that material, whether it be the adult printed material or the devices combined, would not exceed 25%. And we do this in stores across the country. There are over 24 of these stores located in cities like Lexington, St. Augustine, Florida, Oklahoma City, that are not designated under those municipal laws as adult because we do not sell or engage in any activities at that store, any of those stores, that would exceed or trigger the regulation as adult. Are they similarly zoned in those other- Yes. I mean, each city defines their term adult in its own way. But, for example, St. Augustine and I believe Oklahoma City have far stricter regulations as to what triggers regulation as an adult entity. And we've operated there as non-adult successfully for a number of years. So that is what we're hoping to do here as well. We're just looking for the opportunity to open our business. And if we violate the law, they can shut us down, and that's our fault, and we have no ground to argue otherwise. But we don't intend to do that. We're simply looking for the opportunity to open our store and to engage in speech, both adult and non-adult, because we have been prohibited so far from engaging in both adult and non-adult speech, speech of any kind, at that location. And we are hoping to open our doors, follow the law, and if we make the mistake, shame on us. But at this point, we have not had the opportunity to issue a single utterance. Ms. McCann, how does one audit in this industry the percentages of the? So if the city had come to our store and inspected us, they would be able to, if they didn't want to accept our measurements for the floor space, they could measure it themselves and determine how much floor space we had dedicated or allocated to adult material. Then, with respect to the inventory, we would provide them an inventory list with how many items we had on site that fell under the adult category and how many items on site did not fall under the adult category. And they would be able to audit that, and then they would be able to inspect the material themselves if they wanted to raise a concern, well, you know, we think this is adult and this isn't. We could have that discussion, and they would be able to assess that right in front of them with their very own eyes. With respect to the revenue, it's my understanding that we typically. Revenue, did you say? Revenue, yes, because the city would deem us adult if we exceeded 25 percent of our inventory, our floor space, or our sales of adult material at that store. So with respect to the revenue, it's my understanding, and I don't have the proprietary formula at my access right now, but what the store does is it keeps its inventory and its floor space artificially lower of adult materials so that if for some reason this month several more people than ordinarily would come in to buy that material, they have a buffer in terms of the allocation for their sales. So it's quantifiable. We've been audited. I don't have it in the record, but we've been audited in other cities, and we've passed the audits for being a non-adult establishment at those locations, locations that do not require us to get a permit as an adult business. I wanted to draw your attention briefly. I have about a minute and a half before I'll need to break for my rebuttal argument, but I wanted to draw your attention to a case from the First Circuit, Fantasy Bookshop. And in that case, the First Circuit looked at a city's denial of permit applications for several bookstores, adult bookstores, and the city denied those based on four statutory grounds. The First Circuit dismissed three of those statutory grounds as being facially unconstitutional, but the fourth ground survived scrutiny, and the court went on to analyze how a city had assessed its evidence or marshaled its evidence as to why the bookstores had violated that provision of the code. And in essence, what the First Department found and hinted at in remand to the district court was that this evidence that was purportedly of facial neutral factors was a mere ruse for de facto discrimination on the basis of unwanted content. And I think that that case is instructive to this court as to how to resolve this issue. We're not coming here and challenging the city's ability to enact statutes to ameliorate negative secondary effects. What we're saying is that the way it was applied to our client in this case, in which the city manufactured evidence to essentially fulfill whatever items they wanted to present as content neutral indicia was in fact just a mere ruse for the city's opportunity to squelch this unwanted and unpopular speech. And that case by the First Circuit said that when you have evidence of this, when you have more than a hint of bias, and I think we have more than a hint of bias here with the public statements of city officials, it is the federal judiciary's obligation to engage in a scrutinizing review of what went on. Otherwise, the First Amendment would have no teeth. Because what the city cannot do with enactment, it would be able to do with application. And that's what I'm asking this court to do. And I'll break now for my rebuttal. Thank you. Thank you, Ms. Montgomery. Ms. Verge? Good morning, and may it please the court. My name is Nabila Verge, and I'm here with my co-counsel, Tom Moore, and we are assistant corporation counsel for the city of Indianapolis. The district court's order should be affirmed because Hustler has not been silenced, nor has it been banned from speaking. It has simply been asked to move across the street where adult businesses may operate as a matter of right. Just as the district court declined to act as the zoning board and reweigh the evidence, this court should do the same. But when this court does review the zoning board's evidentiary record, it will not find pretext, but will instead find substantial evidence that Hustler is an adult entertainment business based on two things. One, its own submissions, and two, the additional evidence that was submitted by the public and Business and Neighborhood Services, which is an agency within the city. Business and Neighborhood Services is the agency within the city that gives structural and sign permits. And Hustler applied for a sign permit, and the BNS accepted that permit, and on page 250 through 255 of the record is that sign permit in the administrative record. And their sign permit said they're Hustler Hollywood, and they plan on selling lingerie and erotica. When the city's administrators saw that, they questioned whether or not Hustler's use was going to be a conforming use. So they asked Hustler to submit information to clarify what type of business that they were. So their initial submission, which is on the administrative record at page 256, is a pie chart, and it says Hustler Hollywood, and it's got an inventory and sales breakdown. In that exhibit, in that submission, they have listed a bunch of categories, and they have specifically identified adult parties, adult toys, adult magazines, adult DVDs, adult books. The total for that category is 16.1%. I assume everything that says adult is unquestionably whatever you want to call it. We're presuming. The kind that a lot of people would find objectionable. Yes. I don't know who makes those determinations. Well, Your Honor, the zoning ordinance in Indianapolis specifically identifies what is an adult product or not, and you can find those definitions in the administrative record at page 244. It goes through and identifies what's an adult product, what's an adult business, what's an adult bookstore, what's an adult services establishment. An adult product is defined, and without being overly graphic for the court, it is items that display breasts or genitals of humans, and that doesn't just mean pictures. It could also be like bachelorette party games where we have penis straws or penis plates, and there's evidence that those. That's part of the bachelorette stuff? Sure. They have a category for adult party. There's no adult party in their second submission, which is on the record at page 304, but if you look at the record, there are pictures of the party section, and there are plates that have penises on them. Those are obviously adult. That can't possibly fall under the games, party, and toys section. So if you look at that initial pie chart, which is that inventory and sales breakdown, you see adult products comprise 16.1%, and then there's this category called sensual care, which is not defined, and a reasonable person could assume that that includes adult products. What is it called? Sensual care. Sensual. And if you add those two together, we're at 28.6%. Then you have general merchandise, but they don't tell the city what general merchandise is. They do give, Exhibit B of the staff report at page 260, definitions of what their various categories of products are. They say that in the remaining section of the sensual care area, which is non-adult, that there will be marital aids. Marital aids, by their dictionary definition, are adult sex toys. They never defined them as anything else until they were before the BZA. So there's vague definitions. Hustler's own submissions, their slides that they presented to the BZA, included reference to workshops, and that's on page 276. Their store layout, which is Exhibit C and D of the staff report, show that the specialty goods area and the adult area are both behind this wall. Well, why would the specialty area need to be behind the wall if it didn't contain adult books or adult materials? So in the store they are segmented aside where you either don't have access or you've got to show your ID or to do something? Yes, Your Honor. Yes, there's a separation wall for specialty goods and then adult goods. But they're both behind the wall, and the city reasonably inferred that some of the items that were in the specialty goods were also adult based on the description of business attachment, which is in the record. Well, what is it? For the other 75%, who are the audience for that? Who buys that stuff? That would be an excellent question for Hustler. Well, I know, but it's got to come up with 75% of the revenue. Well, it would be difficult to assess revenue here because they hadn't opened, so the city can't adequately rely on the revenue category. The city can only reasonably look at what do you tell us that you're going to sell and what is your breakdown of area of square footage for various products. And when you look at their submissions, their initial submission, their second submission, which is on page 304 of the record and looks completely different from the initial one and is different in ways that I think are significant for this court. The new submission is missing categories, specifically newsstand and novelty items. The novelty items are described in their attachment, and it obviously includes adult items, including vibrators and other items of that nature. They've also changed categories. In their initial submission, they had an adult party section, and in their next submission, they just had a party section. They used to have an adult toy section. Now they've got a games party toy section. They had toys as a separate category in the first submission, and then toys gets lumped together in the second submission. And then in the second submission, that table at 304, they've got five new categories, adult products, games, parties, and toys, jewelry, accessories, lingerie, shoes. The easiest way that Hustler could have convinced the city that it wasn't going to sell adult goods is to actually give us an itemized list of their inventory. And the city could have determined without question how much of what they planned on selling, but they didn't do that, nor did they give us the definition of marital aids until the BZA hearing. But the city didn't act in an arbitrary fashion by taking the dictionary definition, which is sex toys. Hustler's own website, which is in the record at page 563 through 571, has a tab for... Hustler says marital aids are condoms. Hustler's website has a condoms tab, but doesn't have a marital aids tab. The point of all of this is to show that the city reasonably determined that Hustler qualify as an adult entertainment business, and so the staff recommended that those two permits be denied. Hustler, instead of applying for a variance, appealed that decision to the Board of Zoning Appeals, which is a five-member panel of volunteers from the city that assessed the evidence put before it by Hustler, by the public, and by the staff of BNS. And when they took all of that information together, the Board of Zoning Appeals said, no, we think you're an adult business. And now Hustler is saying that we have discriminated against them in violation of their First Amendment rights because we applied the ordinance to them when they aren't an adult business. So the question in this case really boils down to what is Hustler? Is it an adult business or not? If it's an adult business, it needs to go across the street. If not, it would be allowed to operate there. But that specific question does not implicate the Constitution. That question would have properly been brought for judicial review in state court where the state could have evaluated the evidence that was before the BZA and determined whether or not it was arbitrary and capricious that the BZA determined Hustler to be an adult business. Is there any concern in the city about the type of people, customers, the type of people that would come in there? Certainly. What is that? The ordinance talks about the negative secondary effects that are associated with adult businesses of this kind. And so that was the purpose for enacting the ordinance, to move not to ban adult businesses altogether, but just to move them away from residential areas, from churches, from schools. They could have entered into a lease across the street, and it would have been fine. They didn't do that. Of course, that's just like any adult bookstore or something. It's 100%. Absolutely. It was fine to usually find out in the sticks. I beg your pardon? Whatever they call adult bookstores, they're usually separated from a lot of other places. Exactly. Neighborhoods and that sort of thing. So that seems to be the alternative. They may be looking for a different clientele. I don't know. I don't know that mothers and kids would be going in there. There certainly was a lot of public opposition to them going next to the Chuck E. Cheese in the middle of our town. Is that where a kid can be a kid? Well, sure, and I guess the adults can go be adults, too, if Hustler were permitted to open. The Board of Zoning Appeals had plenty of evidence before it that Hustler was not a credible witness. And the BZA, as Judge Barker properly pointed out in her order, is allowed to take in all the evidence and decide the weight of that evidence and the credibility of the people before it. Hustler, you'll notice in the long record on page 60, that Hustler has run into this problem before. In Kentucky, they told the state that they were going to be a coffee shop. And then they opened, and they were an adult business, and litigation ensued. That was before the BZA. So the BZA was allowed to say, you know what, we can look at you with a little bit of skepticism based on its past conduct. If we take Hustler's evidentiary arguments to their literal conclusion, it would render zoning laws and BZA hearings meaningless. The Zoning Board correctly found that Hustler's evidence was contradictory, inconsistent, and recalculated. And that's on the record at page 576. It argues that the city could have let them open and put conditions on them. We could have done that had they applied for a variance. They didn't. Hustler will also say, you're not allowed to look at what we do in other stores because we are a distinct corporate identity. You can only look at what the Indianapolis Hustler was going to do. But Hustler cited – Why was that? They couldn't look in other places? Examples? There's not a model store someplace that they would compare it to? Well, what had happened is a city county counselor, Christine Scales, went to the Hustler store in Ohio and took pictures of their inventory and submitted it to BNS and said, from my view of things, it looked like 50% of their goods are adult. And Hustler argues now before this court that the city was not allowed to take that evidence under consideration but has cited no legal authority that supports that position. Even now, before the district court, it is clear that Hustler doesn't know what these categories are. In the transcript of the preliminary injunction hearing before Judge Barker, my colleague's co-counsel, Paul Cambria, said that Hustler planned to sell bondage materials, which under our definitions of adult products are adults. He then came back and gave a supplemental record, which is that supplementary list of cases, and said, oh, that bondage material really falls under the games category. It's not adult. So it's reasonable to assume that Hustler is an adult entertainment business based on all the evidence that was before the BZA and that is before this case now, before this court now. What do you know as far as they're getting some kind of a predetermination when they leased this land? Does somebody from the city say, yeah, you're okay, as opposed to going across the street? Well, the record will show that Hustler's counsel emailed somebody at the city and said, are you guys changing your zoning rules for adult bookstore? And the person from the city responded and said, no, here's the definition, cut and pasted it exactly from our old ordinance, which is what it is now. Hustler never said what they were going to be. Hustler never said, hey, if we do this, are we that? They just merely asked for the definition, and the city gave it to them. Most zoning disputes do not trigger a constitutional issue, and this one certainly doesn't. Hustler hasn't given the court any reason to believe that the zoning board acted in a discriminatory fashion. Therefore, the district court opinion should be affirmed. I thank you very much for your time. Thank you, Mr. Chair. Ms. McCampbell. I just have a couple quick points that I'd like to make on rebuttal. The first is that when the city opened up C3 zones to all general light businesses that do not carry in excess of 25% of adult material, they opened up that area for those types of businesses. So the fact that our client wants to operate there and is unable to, our client has been silenced from a location where it's been told it can operate, in theory. In the Third Circuit, in the case United States v. Markovage, I cited in my brief, the Third Circuit made it clear that when a speaker is entitled to speak at a particular location, no matter how offensive it is, including if it's eight-foot tall posters of aborted fetuses in front of the Liberty Bell, they're entitled to be there. And regardless of what impact it may have on the people surrounding the area, if they're allowed to be there under law, they must be allowed to speak from that location. And that's what we're asking to do here. We are a business that is not going to sell in excess of 25% of adult material, and we're not going to do anything else that would trigger regulation as an adult entity under any of the other definitions in the code. I want to take a minute to speak about our submissions. No case is perfectly litigated. I wish that our initial projections did not include projections for the parent company's e-commerce websites, but they did, and it was an error, and we immediately corrected it and explained why it was an error, and explained why our projections were distorted. But the city has refused to accept that explanation from us. I don't want you to get too bogged down into categories, whether something is a toy or whether something is adult based on what category it's in. The bottom line is we have stated under oath repeatedly and in sworn affidavits to the court that the city's definition of adult, which is in their code, we will not carry more than 25% of material that meets that definition. Now, if the city had allowed us to offer them the opportunity to inspect our data, they would have looked at that, and they would have been able to see that we weren't going to play fast and loose with the rules. And I want to mention that this case is here because it is a constitutional issue. The First Amendment is at stake here. If what the city has done here is allowed to be acceptable for an application of a neutral statute, the First Amendment has no teeth. The city has pointed to cases involving substantive due process claims, and that's not what we're making here. We're making a First Amendment claim, which is one of the most fundamental privileges and rights that we have in this country. If the city had come to our store and there was a dispute about whether a particular item qualified as adult or whether our square footage was what we said it was and that sort of thing, if we couldn't make some sort of agreement on that issue, we could have then taken, and they denied our permit to open, we would have then brought an action to state court. That would have been appropriate because the only issue there was the interpretation of state law. What you have here is content-based discrimination against our client because it was unpopular. If you look at the record that was presented to the BZA, the submissions from residents and testimony from city officials was completely in content-based terms. They didn't want our client. The words they used were, we don't want this here. It's going to degrade the morality of the area. And that doesn't survive scrutiny of any sort, specifically not first strict scrutiny, which is required here because the content here is protected. Everything we're doing here, whether it's the adult books or whether it's the non-adult books, the non-adult material, all of it is protected material, and there's no hierarchy of protection in the constitution. If it's protected, we are allowed to engage in that speech. And to the extent that any entity, whether it's the city or otherwise, seeks to suppress our speech, that subjects them to strict scrutiny. Well, the other thing I asked before, and maybe you could answer that, and that is for the clientele. Yes. And actually, it's in the record, and I was not able to fumble around and find the citation, but our particular client base that we target is women in their 30s. That's why we don't want to be – Women in their 30s? Yes. We don't want to be in the areas that typically are industrial and vacant, where adult stores typically and strip clubs, that sort of thing, are. We're not looking for that type of clientele. What if women in their 30s have a kid in tow? Is that – Well, that's their choice, whether they want to bring that child into the store or not. Well, I can understand that, and that's what I'm saying. You know, Toys R Us is shutting down. I mean, is this an alternative place for somebody to come for toys? Not for children's toys, no. There will be 75 percent or more material that is non-adult and then a certain portion that would be adult. Thank you very much for your time. Thank you, Ms. Burtick. Case is taken under advisement.